UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,                        FINDINGS OF FACT AND
                                                                 CONCLUSIONS OF LAW
   -against-                                          15 CR 466 (ILG)

JUSTIN SMITH and EVELYN PERSON,

                Defendants.
----------------------------------------------------x
GLASSER, United States District Judge:

        The defendants are charged with conspiracy to possess with intent to distribute drugs, maintaining a stash house and unlawful use of a firearm. Smith is charged with an additional count of possession with intent to distribute drugs; conspiracy to commit and to attempt to commit Hobbs Act Robbery, witness retaliation and two counts of being a felon in possession of a firearm. They have moved this Court for an Order that would suppress evidence they allege was seized in violation of the Fourth Amendment of the United States Constitution. A hearing was held in pursuit of that Order and leads the Court to make the following findings of fact and conclusions of law.

## **Findings of Fact**

        At approximately 8:30 in the morning of June 18, 2014, officers of the New York Police Department went to Evelyn Person's apartment 6B at 185 Nevins Street in Brooklyn, to execute two outstanding warrants for her arrest. She opened the door in response to a knock and, standing in the doorway, was told by the police that they were executing warrants for her arrest. The police arrested and handcuffed her. She requested permission to change her clothes and was taken to her living room, where she was seated on a couch to await the arrival of a female police officer who was summoned

to accompany her while she changed her clothes.  A drawing of the apartment received in evidence as the Government's Exhibit 1, shows that the living room is open to view and flows without obstruction steps immediately to the left of the apartment doorway. Once in the living room, the officer conducted a protective sweep for his safety.  There, in plain view on the couch, the officer saw a plate on which was a white powdery substance, a razor blade, and a cigarette lighter.  Under a night stand on the floor next to the sofa, the officer also saw a box of ammunition.  He also saw a live round on the table inside the living room.

At about the same time while this was taking place, the defendant Smith appeared from a rear bedroom approaching the living room, was immediately handcuffed and seated on the sofa next to Person.  Officer Reilly, a member of the police team on the scene, saw Smith "fidgeting around" while seated there and recovered "a glassine envelope with a tan powdery substance and also a ziploc bag of a white rocky substance." (Hr'g. Tr. 11:15-18, ECF No. 58.)  Officers who then made a protective sweep of the apartment were prompted by the sight of what they believed to be more contraband in the rear bedroom from which Smith emerged, froze the apartment, secured the bedroom door and proceeded to obtain an emergency search warrant.  (Hr'g. Tr. 17:19.) An affidavit by Officer Thevenin in support of a search warrant described the drugs and ammunition observed in plain view in the living room.  The warrant was issued later that afternoon by a Justice of the Kings County Supreme Court.  In the midst of this activity, Officer Elizabeth Medina of the NYPD arrived, accompanied Ms. Person while she changed her clothes, patted her down, handcuffed her and transported her to the 73rd Precinct.

Hours later, after obtaining the warrant and returning to the apartment to search it thoroughly, drugs, ammunition and firearms were seized which, together with the contraband seized in plain view, are the subjects of this motion to suppress. The theory upon which the motion rests is that the seemingly innocuous encounter between the police and Ms. Person in her doorway was not innocuous at all, but was an unwanted and unlawful entry into her apartment. It would follow, then, that everything that was seized in it was forbidden as was the apple in the Garden of Eden and metaphorically thereafter referred to as the fruit of the poisonous tree.

The disposition of this motion is determined by this Court's evaluation of the credibility of the witnesses. Two were called by the government; Angel Thevenin, the arresting officer, and NYPD Officer Elizabeth Medina. The defendant, Evelyn Person, testified on her own behalf. Having observed the witnesses, their demeanor as they responded to questions on direct and cross examination and critically assessed the substance of their testimony, I am driven to conclude that Officers Thevenin and Medina truthfully related what occurred at approximately 8:30 in the morning of June 18, 2014 in apartment 6B at 185 Nevins Street in Brooklyn and the Constitution of the United States was not violated.

The account of what occurred on that morning is as recounted above and represents my findings of fact. Those findings were based largely on the testimony of Officer Thevenin. His account of what transpired at the crucial and transformative moment when Ms. Person came to the door in response to the officers' announcement was unimpeached, but sought to be discredited by Ms. Person. Virtually all of the cross examination of Officer Thevenin was devoted to such inconsistencies as they were able

to discern in his description of where precisely one piece of living room furniture was in relation to another and to cast doubt about whether there ever was a white plate on the couch with a razor blade, cigarette lighter with a white powdery substance on it. The inconsistencies, which in the Court's view, were *de minimis*, were sought to be established by photographs of isolated portions of the living room and of Smith's bedroom which were of questionable relevance. Frequently overlooked in a critical evaluation of such cross examination as they purport to undermine the credibility of a witness, is that the minutiae they inquire about occurred, as they did in this case, almost two years ago and inconsistencies are inevitable. Some might regard a precise minute by minute, inch by inch recall after such a time lapse with suspicion. However, emphasis might be placed, although note was taken of it briefly, on the fact that the photos relied upon were taken by Thevenin with his phone at 6:00 p.m., almost 10 hours after the events were described and the apartment was secured. But far more important was the following corroborating colloquy on cross examination of Ms. Person:

> Q You mentioned that you heard one of the officers say "Plain View;" is that true?
> 
> A Yes.
> 
> Q Did you see the items that he said was in plain view?
> 
> A Yes.
> 
> Q Those items were a plate with some drug residue on it?
> 
> \* \* \*
> 
> A Yes, there was a plate with a lighter and a razor blade.

>    Q       And drug residue on it?
>
>    A       I did not see any residue on the plate.

Hr'g. Tr. 86:22 - 87:10.

Returning to the arrival of the police at 8:30 that morning and the defining moment regarding Person's contested request to change her clothing, a review of the transcript of her testimony will validate the Court's assessment of her credibility. On her direct examination she was asked:

>    Q       Tell the judge what, if anything, happened when you were – 8:30 in the morning?
>
>    A       Well, when I woke up, I went to brush my teeth, and there was a bang at the door. <u>So, I went to see who it was, and three men turned around and announced themselves as police officers who had a warrant for me. So, I told them to hold on, because I still had toothpaste in my mouth. I finished freshening up.</u> (emphasis added.) I had already been dressed, so I went – I just grabbed my keys and things to go, and when I went to the door, I opened it and I greeted them with a hello.

Hr'g. Tr. 79:16 - 80:1.

On cross examination, the following colloquy is recorded:

>    Q       Now, I want to go into – you testified that the circumstances were that you woke up and went into

5

> the bathroom, when you heard knocking on your door; is that correct?
>
> A  Yes.
>
> Q  Then you went from the bathroom to the front door; correct?
>
> A  Yes.
>
> Q  And then you told the police officers – you opened the door; correct?
>
> A  No. I told them to hold on.
>
> Q  You told them to hold on after you had opened the door; correct?
>
> A  No. Before I opened the door.
>
> Q  Before you opened the door?
>
> A  Yes.

Hr'g. Tr. 84:18 - 85:8.

Further on she testified:

> Q  . . . two of the officers, after the door was opened, pushed past you?
>
> A  Yes.
>
> Q  And you weren't handcuffed at the time?
>
> A  No.
>
> Q  And it's your testimony that a third officer then walked past you and still hadn't handcuffed you?

> A Exactly.
>
> Q So, it's your testimony that all three officers went past you and left you unhandcuffed behind them?
>
> A Yes.
>
> Q And that it wasn't until you went into the living room that you got handcuffed in the living room?
>
> A Yes.
>
> Q Ms. Person, you heard that recording earlier that the government played; is that true?
>
> A Yes.
>
> Q And you heard on the recording the individual[1] on that recording say that you were handcuffed at the door; do you remember that?
>
> A Yes.
>
> Q And so, what that person said on the recording is not true or not accurate?
>
> A No. He wasn't even there.

Hr'g. Tr. 85:18 - 86:16.

Of particular significance in this regard is the testimony on direct examination of what she wore when she was arrested. Having credited the testimony of Officers Thevenin and Medina that she did request to change her clothes, the following is

---

[1] The "individual" is the defendant Justin Smith speaking on a recorded telephone conversation, Government's Exhibit 2, from Riker's Island. ". . . I come out the back room, they cuff her from the door . . . ."

7

informative:

  Q  What were you wearing when you heard that the police were at the door? I want you to be very specific.

  A  I had on jeans and a striped tank top.

        \*   \*   \*

  Q  The police come, you open the door?

  A  Yes.

  Q  What are you wearing?

  A  A striped tank top and blue jeans.

Hr'g. Tr. 80:2-15.

  Then received in evidence as Defendant's Exhibit A is a photo of Ms. Person, taken "<u>recently</u>" (Hr'g. Tr. 83:8.), she testified and identified the clothes she was wearing as the clothes she wore when she opened the door, a striped tank top and blue jeans.

  Apparently not recalled was counsel's earlier cross examination of Officer Thevenin from whom he elicited as having described on the on-line arrest sheet, a document he always fills out when making an arrest, a description of the clothing she was wearing when she was arrested:

  Q  What does it say?

  A  "Clothing. Headgear, baseball hat, white;

     "Clothing, accessories, sweat jogging clothes, gray;

     "Clothing. footwear, sneakers, gray;" and

     "Clothing, outerwear, T-shirt or tank top, white."

  Q  That document you always fill out when you make an

>arrest; correct?
>
>A   Correct.

Hr'g. Tr. 40:1-10.

The cross examination of Officer Medina buoys the Court's confidence in the assessment of Person's credibility. That inquiry was as follows:

>Q   You basically walked her to a bedroom, where she changed; is that correct?
>
>A   That's correct.
>
>Q   Do you remember what she was wearing prior to changing?
>
>A   No.
>
>Q   I show you what's been marked as Defendant's Exhibit A for identification?
>
>Does that refresh your recollection as to what she was wearing?
>
>A   I just can't remember exactly.
>
>\*   \*   \*
>
>Q   All right. After she changed, you were one of the two officers who placed her in a patrol car and took her to the precinct; is that right?
>
>A   That's correct.
>
>Q   And you handcuffed her, then, in the apartment; is that correct?

9

> A That's correct.
>
> * * *
>
> Q What clothes did she change into?
>
> A It was like a gray jumpsuit.

Hr'g. Tr. 69:5-23; 70:6-7.

## Conclusions of Law

Given the facts found by the Court, the relevant principles of law are readily revealed and compel the conclusion that the Fourth Amendment was not violated and the motion to suppress must be denied.

The movant of a motion to suppress initially bears the burden of establishing that his person or his property was subjected to a search and seizure by an officer of the government acting without a warrant. The burden is not a heavy one. In this case it was satisfied simply by a sworn statement of Ms. Person that officers of the New York City Police Department entered her apartment without a warrant and without her permission and that everything in it that was seized thereafter by a search of her apartment was illegally obtained and the evidence of it must be suppressed. The burden then shifts to the government to establish by a preponderance of the evidence that the search and the seizure did not offend the Constitution.

It is by now and has been for a long time understood that the objective of the Fourth Amendment was to deter law enforcement officers from acting lawlessly by forbidding the use of the evidence they seized by a warrantless search. Over time, the rigid exclusionary impact of the Fourth Amendment was seen to disserve other societal interests expressed by the famous admonition by Judge Cardozo in <u>People v. Defore</u>,

10

242 N.Y. 13, 21 (1920), that "the criminal should not go free because the constable blundered." Discrete exceptions to the Amendment's application were created to accommodate its objective and the interests of society. One of those exceptions is exquisitely applicable here and was clearly stated by Justice White, writing for the Court in Maryland v. Buie, 495 U.S. 325 at 334-335 (1990), as follows:

> We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.
>
> * * *
>
> We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

An examination of the layout of the apartment, attached as Government's Exhibit 1, reveals the living room as a virtual spatial extension of the entrance. It is plainly the space "immediately adjoining the place of arrest in which the officers could look, in the exercise of precaution for their safety without probable cause or reasonable suspicion." The justification of the exception was provided by the unexpected appearance of Smith, a felon now charged with the possession of a gun, who might as easily have hidden behind the sofa upon hearing the knock on the door.

It is worth noting that the ammunition box, live round, white powdery substance

together with a razor on a plate in plain view, together with the appearance of Smith provided the articulable facts and reasonable inferences to be drawn from them to warrant a reasonably prudent officer to believe that the rest of the apartment might "harbor another individual posing a danger to the other officers." Buie, 494 U.S. at 334.

The memorandums of law submitted by the parties in support of and in opposition to the motion are replete with citations to cases of varying fact patterns, an extended discussion of which would add little to the teaching of Buie in relation to which they are merely commentary.

In addition to the foregoing exception to the Fourth Amendment, the government opposes the motion to suppress by invoking another recognized exception referred to as a "duty to clothe." Although that "duty" is referred to in the cases, see, e.g., United States v. DiStefano, 555 F.2d 1094, 1101 (2d Cir. 1977), the precise meaning and application of "duty" in this context is interesting to consider. I resist the temptation to do so, instead, denying the motion upon another related ground which I regard to be more precisely applicable upon a reading of the following cases.

In United States v. Reid, 769 F.3d 990 (8th Cir. 2014), Officers arriving at the home of the defendant to execute a warrant for her arrest found her outside dressed only in her pajamas. They allowed her to reenter her home to change her clothes. She was accompanied by an officer to her bedroom where she changed from pajamas to clothes and where he saw an assault rifle in plain view. In her motion to suppress she argued that accompanying her to her bedroom did not justify his warrantless entry into it because she didn't request to reenter. In denying her motion, the Court wrote at 992-993:

12

> When an arrestee chooses to reenter her home for her own convenience, it is reasonable for officers to accompany her and to monitor her movements . . . It is true that there is no testimony directly quoting [her] as making such a request. But the district court found that the deputies "allowed" [her] to reenter and this finding is best understood in ordinary usage as a grant of permission. <u>A grant of permission implies a request</u> (emphasis added; internal citations omitted.)

Having found that the defendant, at the doorway to her apartment in handcuffs, requested permission to change her clothes, an <u>implication</u> of a request is not required here. There is testimony that she directly made that request. Hr'g. Tr. at 6 and it was "reasonable for an officer to accompany her and monitor her movements."

Frequently cited in this regard is <u>United States v. Debuse</u>, 289 F.3d 1072 (8th Cir. 2002). Officers went to the defendant's home to execute a warrant for his arrest. He answered the door and was handcuffed outside. He was barefoot and asked to reenter his house to get his shoes and socks. Officers escorted him inside and saw a rifle hanging on the wall in plain view. They then conducted a protective sweep of the house and saw many other rifles in plain view. He was charged with being a felon in possession of firearms. He conditionally pleaded guilty and subsequently argued on appeal that the arrest of a person outside his home does not justify a warrantless search of it. In rejecting his argument, the Court wrote at 1074-1075:

> One of the exceptions to this rule, however, is when an officer accompanies the arrestee into his residence to obtain clothing or identification . . . Thus, contraband seen by an officer in plain view while accompanying the arrestee in his home may be lawfully used against the arrestee.
>
> Here, Debuse chose to reenter his house simply for his own convenience . . . . Because the officers were legally entitled to accompany Debuse as he reentered his home, they were

13

legally in the position to see the rifle hanging on the wall as they entered.

It requires no extrapolation to conclude that so too was Officer Thevenin legally in position to see the plate, the ammunition box and the live round.

Among the cases cited in the above excerpt is United States v. Gwinn, 219 F.3d 326, 333 (4th Cir. 2000), where the Court held that "without the arrestee's request, his partially clothed status may constitute exigency justifying officer's temporary reentry into arrestee's home to retrieve clothes." It is noteworthy that the Gwinn Court joined the Second Circuit in holding in United States v. DiStefano, *supra*, that the officers had a duty to find clothing for an arrestee in their custody or permit the arrestee to do so. Though stated as "permission implies request" it might also be understood in more legally familiar terms, as request implies consent. That is to say, by requesting to change her clothes, Person impliedly consented to doing so under the arresting officer's watchful eye.

The pronouncement of the Supreme Court in a factually related case is noted as relevantly applicable to informing the determination of this one. In Washington v. Chrisman, 455 U.S. 1 (1982), the Court held that:

> it is not "unreasonable" under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest. The officer's need to ensure his own safety – as well as the integrity of the arrest – is compelling. Such surveillance is not an impermissible invasion of the privacy or personal liberty of an individual who has been arrested.

Given those findings of fact and conclusions of law, their motions to suppress are

denied.

SO ORDERED.

Dated: Brooklyn, New York
June 3, 2016

/s/
I. Leo Glasser